UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN URBANO, et al.,<br><br>               Plaintiffs,<br><br>    v.<br><br>JUSTIN TIMBERLAKE, et al.,<br><br>               Defendants. | Case No. 2:22-cv-04512-FLA (Ex)<br><br>**ORDER DENYING DEFENDANT JUSTIN TIMBERLAKE'S MOTION TO STRIKE AND/OR DISMISS ALL CLAIMS FOR RELIEF IN THE FIRST AMENDED COMPLAINT PURSUANT TO C.C.P. § 425.16 [DKT. 42]** |

## RULING

Before the court is Defendant Justin Timberlake's ("Timberlake") Motion to Strike and/or Dismiss All Claims for Relief in the First Amended Complaint ("FAC") Pursuant to California Code of Civil Procedure § 425.16 (the "Motion"). Dkt. 42 ("Mot."). Plaintiff John Urbano ("Urbano") opposes the Motion. Dkt. 44.

On November 28, 2022, the court found this matter appropriate for resolution without oral argument and vacated the hearing set for December 2, 2022. Dkt. 48; *see* Fed. R. Civ. P. 78(b); Local Rule 7-15.

For the reasons stated herein, the court DENIES the Motion.

# BACKGROUND[1]

Urbano is "an artist known for creating photographs, music videos, and commercials[.]" Dkt. 35 ("FAC") at 2.[2] Timberlake is a "well-known singer and entertainer who frequently and routinely conducts entertainment-based business[.]" *Id.* ¶ 8. The FAC avers that, in April 2012, Timberlake sought to shoot and edit a documentary film about the making of his upcoming third studio album, *The 20/20 Experience* (the "Album"). *Id.* ¶ 16. Timberlake's agent consulted with HSI Productions ("HSI"), which recommended Urbano to shoot the film. *Id.* ¶¶ 17–18.

According to Urbano, during an initial meeting on May 2, 2012, Timberlake "told Urbano that he wanted [Urbano] to capture the whole thing, claim some directorial ownership of it with Timberlake, and bring Urbano's own take to the project[.]" *Id.* ¶ 26. However, Timberlake warned Urbano not to expect upfront payment for creating the documentary, as Timberlake did not intend to inform his label he was making the Album until later in the process. *Id.* ¶¶ 35, 37. Timberlake intended to take the completed documentary to "someone like his label and say, 'Pay us.'" *Id.* ¶ 42. To build demand for the film, Timberlake also agreed to promote the documentary on social media. *Id.* ¶ 45.

Based on the representations at the initial meeting, Urbano alleges he accepted Timberlake's terms and agreed to make a documentary about the Album (the "Documentary").[3] *Id.* ¶ 51. Timberlake enlisted his company, Tennman Entertainment, Inc. ("Tennman"), to reimburse some of Urbano's out-of-pocket expenses. *Id.* ¶ 60. Timberlake also hired and delegated certain tasks to HSI as a producer, including managing the budget, acting as middleman for financial

---

[1] The facts recited here are as alleged in the FAC.

[2] The court cites documents by the page numbers added by the CM/ECF system rather than any page numbers listed on the documents natively.

[3] Once filmed, the Documentary was officially titled *Making of the 20/20 Experience*. *Id.* ¶ 69.

2

contributions, and coordinating logistics. *Id.* ¶ 61.  On May 4, 2021, HSI submitted a bid and budget to Urbano, which detailed expenditures associated with creating the Documentary.  *Id.* ¶ 62.  The bid reflected that Urbano would charge only a $10,000 director's fee and a $10,000 editor's fee in order to receive a significantly larger payment later once Timberlake and Urbano took the Documentary to Timberlake's label together.  *Id.* ¶ 63.

On May 8, 2012, Urbano claims he sent Timberlake a mood board laying out the creative direction for the Documentary.  *Id.* ¶ 70.  Timberlake liked Urbano's ideas, and the two began discussing the Documentary the next day.  *Id.* ¶ 71.  On May 10, 2012, Urbano traveled to Los Angeles, California to begin documenting Timberlake and other artists as they made the Album.  *Id.* ¶ 72.  Tennman reimbursed Urbano's company, Urbano & Co., for certain expenses, including equipment rentals, shipping, travel, and food.  *Id.* ¶ 73.

On June 17, 2012, Urbano states he told Timberlake he had created about 20 terabytes of footage.  *Id.* ¶ 76.  Urbano claims Timberlake responded that: he had also been thinking about the Documentary, the time recorded in the studio was "magical," and he wanted to carry it over to the tour process.  *Id.* ¶ 77.  Timberlake told Urbano to continue editing and "keep him in the loop" regarding the process.  *Id.* ¶ 78. Timberlake also asked Urbano to film an additional twenty-nine days over a two-year period.  *Id.* ¶ 79.

From September 2012 to April 2014, Urbano alleges he filmed Timberlake in Los Angeles, Tennessee, New York, Ohio, and France.  *Id.* ¶¶ 80–85.  Tennman reimbursed Urbano & Co. for certain expenses incurred during those filming days.  *Id.* ¶ 90.  Urbano claims Timberlake never worked on editing the Documentary with Urbano.  *Id.* ¶ 89.

Between October and November 2012, Timberlake's representatives requested Urbano create and edit a separate trailer to launch the Album.  *Id.* ¶ 92.  Urbano separately shot and edited the trailer, which Timberlake released on January 10, 2013.

3

1  *Id.* ¶ 93.  Timberlake later released a second trailer using footage from the
2  Documentary to promote the second installment of the Album on August 25, 2013.
3  *Id.* ¶ 94.
4      Urbano alleges he spent approximately 2,500 hours editing the Documentary.
5  *Id.* ¶ 95.  In 2012, Urbano's typical director's fee was $20,000 per day and typical
6  editor's fee was $5,000 per day.  *Id.* ¶ 96.  However, Urbano claims to have given up
7  his typical fees in reliance on the joint venture agreement with Timberlake, expecting
8  to receive his portion of the revenue later.  *Id.* ¶ 99.
9      In 2014, after Urbano put together eight different documentary edits, he claims
10 he held "in-person viewings" for Timberlake, gave Timberlake physical copies of
11 each cut, and presented the final cut of the Documentary to Timberlake.  *Id.* ¶¶ 101–
12 03, 106–07.  Urbano then waited for Timberlake to reach out again.  *Id.* ¶ 110.
13 However, the project was shelved for the next five years.  *Id.* ¶ 111.  Due to
14 Timberlake's marketing and entertainment industry knowledge, Urbano claims he
15 trusted Timberlake to determine the right time and buyer for the Documentary.  *Id.* ¶
16 112.
17     Yet, Urbano claims Timberlake eventually "lost enthusiasm" for the
18 Documentary.  *Id.* ¶ 114.  Urbano alleges Timberlake and his representatives "strung
19 Urbano along under the pretense he would be compensated for certain expenses and
20 receive significant compensation through the backend deal."  *Id.* ¶ 115.
21     On June 21, 2018, Urbano states Timberlake "tried to trick [him] into signing
22 an illegally backdated document" that would have characterized the Documentary as a
23 "work for hire."  *Id.* ¶¶ 120, 126–35.  Urbano refused, but granted Tennman a non-
24 exclusive license to use twelve images for Timberlake's upcoming book.  *Id.* ¶ 145.
25     On April 1, 2021, Timberlake's team emailed Urbano to request he transfer all
26 the footage and content he filmed into Timberlake's digital storage.  *Id.* ¶ 147.
27 Timberlake's team emailed Urbano again on April 12, 2021, once more asking for all
28 footage shot.  *Id.* ¶ 148.  Finally, on April 13, 2022, Timberlake's counsel

communicated to Urbano that Timberlake was "not planning on doing a documentary project on [the Album]." *Id.* ¶ 173. Instead, Timberlake intended to create a documentary covering his entire career. *Id.* ¶¶ 174–75. On March 8, 2022, Urbano registered a copyright to the Documentary. *See id.*, Ex. A.

Urbano initiated this action on July 1, 2022. Dkt. 1. Urbano filed the FAC on September 15, 2022,[4] alleging causes of action for: (i) breach of joint venture agreement; (ii) breach of joint venture agreement's implied covenant of good faith and fair dealing; (iii) breach of contract; (iv) breach of contract's implied covenant of good faith and fair dealing; and (v) declaration of copyright ownership. *See* FAC.

Timberlake filed the instant Motion on October 28, 2022. Mot. On November 10, 2022, Urbano filed an Opposition. Opp'n. Timberlake thereafter filed a Reply. Dkt. 45.

On January 20, 2023, Timberlake filed an Ex Parte Application and Motion to stay discovery pending the court's ruling on the Motion. Dkts. 54, 55. On February 23, 2023, the court permitted limited discovery pertaining to "the scope of the agreement between the parties, the terms of the purported joint venture, and damages," but otherwise stayed discovery pending its ruling on the Motion. Dkt. 65.

On November 17, 2023, after conducting limited discovery, Urbano filed an Amended Opposition to the Motion. Dkt. 74. On December 1, 2023, Timberlake filed an Amended Reply in support of the Motion. Dkt. 76 ("Supp. Reply").

/ / /
/ / /
/ / /

---

[4] While the Complaint includes as Plaintiffs both Urbano and Urbano & Company, LLC, and as Defendants both Timberlake and Tennman (*see* Dkt. 1), the FAC omits both Urbano & Company, LLC and Tennman (*see* Dkt. 35).

## DISCUSSION

I.  **Legal Standard**

California's anti-SLAPP[5] statute provides:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal. Code Civ. Proc. § 425.16(b)(1).  The purpose of the anti-SLAPP statute is to deter suits "brought primarily to chill the valid exercise of the constitutional rights of freedom of speech[.]"  *Id.* § 425.16(a); *see also Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013) (the anti-SLAPP statute exists to strike "actions ... that masquerade as ordinary lawsuits but are intended to deter ordinary people from exercising their political or legal rights or to punish them for doing so.") (quotation marks and citation omitted).  "Anti-SLAPP statutes are designed to allow the early dismissal of meritless lawsuits aimed at chilling expression through costly, time-consuming litigation."  *Gardner v. Martino*, 563 F.3d 981, 986 (9th Cir. 2009) (citation omitted).  "The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech.  It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity."  *Baral v. Schnitt*, 1 Cal. 5th 376, 384 (2016) (emphasis in original).

Analysis of a defendant's anti-SLAPP motion involves a two-step inquiry.  *See Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1188 (9th Cir. 2017).  First, "the defendant must make a prima facie showing that the plaintiff's suit arises

---

[5] SLAPP stands for "strategic lawsuit against public participation."  *See Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism*, 4 Cal. 5th 637, 639 (2018).

6

from an act in furtherance of the defendant's right of petition or free speech." *Id.* (citation omitted). That is, the defendant must show that the conduct underlying the case was done "in furtherance of the [defendant's] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue[.]" Cal. Code Civ. Proc. § 425.16(b)(1).

If the court finds the defendant has made such a showing, it proceeds to the second step: determining whether the plaintiff has demonstrated a probability of prevailing on the claim. *Jordan-Benel*, 859 F.3d at 1188. On this second step, "[t]he court does not weigh evidence or resolve conflicting factual claims." *Baral*, 1 Cal. 5th at 384. Rather, the court's "inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prime facie showing sufficient to sustain a favorable judgment." *Id.*

## II. Analysis

The court finds Timberlake fails to satisfy the first element—that the challenged conduct was in furtherance of free speech—and, therefore, declines to address whether the speech was connected to a public issue.

### A. Conduct in Furtherance of Free Speech Rights

Timberlake must first show that the "act underlying the plaintiff's cause of action" was "*itself* ... an act in furtherance of the right of petition or free speech." *Park v. Bd. of Trustees of Cal State Univ.*, 2 Cal. 5th 1057, 1063 (2017) (citation omitted). Here, the "focus is on determining what the defendant's activity is that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning" under the anti-SLAPP statute. *Id.* (citation omitted).

As defined by statute, an "act in furtherance of a person's right of petition or free speech" includes "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech." Cal. Code Civ. Proc. § 425.16(e). That is, "the statute's reach is not restricted to speech, but expressly applies to *conduct*." *Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156, 166

7

(2003) (emphasis in original).  "A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." *Musero v. Creative Artists Agency*, 72 Cal. App. 5th 802, 815 (2021) (quoting *Wilson v. Cable News Network, Inc.*, 7 Cal. 5th 871, 884 (2019)) (emphasis in original).

Timberlake argues his contributions to the Documentary form the basis of his liability as alleged in the FAC.  *See* Mot. at 19–20.  Specifically, Timberlake points out that "artistic and entertainment endeavors" have long been held to constitute an exercise of free speech.  *Id.* at 19 (citing *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981)).  According to Timberlake, this includes acts "that broadly 'advance' or 'assist' those endeavors, e.g., the creation, funding, casting pre-production, production, and distribution thereof."  *Id.* (citing *Ojjeh v. Brown*, 43 Cal. App. 5th 1027, 1032 (2019); *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 143 (2011)).

The court agrees that, broadly, the creation or production of a documentary film is conduct in furtherance of speech.  *See Schad*, 452 U.S. at 65 ("[M]otion pictures ... fall within the First Amendment."); *ITN Flix, LLC v. Hinojosa*, Case No. 2:14-cv-08797-ODW (AGRx), 2019 WL 3562669, at *4 (C.D. Cal. Aug. 6, 2019) ("[T]he creation, production, and distribution of entertainment such as ... film are activities in furtherance of the exercise of the right of free speech[.]").

Further, as Timberlake argues, certain contributions to the creative or production process may constitute acts in furtherance of that speech.  *See Ojjeh*, 43 Cal. App. 5th at 1038–39.  Timberlake's cited authorities, however, are distinguishable from the instant matter.  In *Ojjeh*, the California Court of Appeals found the defendants' conduct fell within the ambit of anti-SLAPP protection where the complaint alleged defendants "failed to perform 'significant' or 'substantial' work on the documentary," despite evidence defendants had completed some work, including soliciting funds from plaintiff, hiring a cinematographer, interviewing witnesses, and producing a sizzle reel.  *See id*.  In *Tamkin*, the court determined that

"defendants' acts helped to advance or assist in the creation, casting, and broadcasting of an episode of a popular television show." 193 Cal. App. 4th at 143.

Here, Urbano claims Timberlake failed to honor the terms of their joint venture and implied contract, including by failing to contribute his "knowledge and skills in the entertainment industry [to] market and negotiat[e] backend deals[.]" FAC ¶ 155. The FAC does not claim Timberlake is liable for a failure to contribute to the creation or production of the Documentary. Timberlake argues he contributed to the production of the Documentary by "assembling a production team, financing and budgeting the film, retaining HIS, retaining Urbano as a director and editor, opening up his recording sessions to filming, shepherding ... production, [and] acting as the featured performer[.]" Mot. at 25. Even accepting as true that any of these discrete acts are sufficient to constitute an act in furtherance of speech, none are the "wrong complained of" in the FAC. *See Musero*, 72 Cal. App. 5th at 815. Rather, they are "just evidence of liability," and not the proper subject of a motion to strike. *Id.*; *Jordan-Benel*, 859 F.3d at 1193 ("[T]he California courts have said nothing to suggest that the State intended its anti-SLAPP law to apply when protected activity is not the target of a claim."). The wrong complained of here is an alleged failure to negotiate a backend deal for Urbano to be compensated, not conduct in furtherance of speech in the public interest.

Because the court finds the challenged conduct in the FAC does not arise from actions in furtherance of a right of free speech, it need not determine whether Timberlake has shown the speech furthered by his conduct was made in connection with a public issue or whether there is a probability of success on the merits.

**B.    Statements Made in Connection With or Anticipation of Litigation**

Timberlake additionally argues that anti-SLAPP protection applies under § 425.16(e)(2). Mot. at 29; Supp. Reply at 7. California Code of Civil Procedure § 425.16(e)(2) provides, as an example of an "act in furtherance of a person's right of petition or free speech," "any written or oral statement or writing made in connection

9

with an issue under consideration or review by a legislative, executive, or judicial body[.]" *See also Neville v. Chudacoff*, 160 Cal. App. 4th 1255, 1263 (2008).

For the same reasons articulated above, this argument fails because Timberlake's alleged improper conduct were not acts made in furtherance of free speech. Additionally, the statements on which Timberlake relies, *see* Mot. at 29–30, are collateral to the course of conduct that forms the basis of Urbano's claims—that Timberlake failed to honor the terms of the alleged joint venture and contract by abandoning the project and failing to secure Urbano's compensation. *See* Section II.A *supra*.

## CONCLUSION

As set forth above, the court finds the conduct complained of in Urbano's FAC does not constitute conduct in furtherance of free speech rights and DENIES Timberlake's Motion.[6] The parties are ORDERED to meet and confer within fourteen (14) days regarding an updated case schedule and submit a joint report to the court regarding same within twenty-one (21) days of this Order.

IT IS SO ORDERED.

Dated: January 31, 2024

_____
FERNANDO L. AENLLE-ROCHA
United States District Judge

---

[6] The parties' various evidentiary objections, *see* Dkts. 46-47, 50, 77–80, 85–88, are DENIED.